[See 12 Fed. 157.]

## Case No. 4,494.

### ENSIGN v. The PEERLESS.

[12 Chi. Leg. News, 41.]

District Court, E. D. Wisconsin. Oct. 18, 1879.

H. H. & Geo. C. Markham, for libellant. Geo. Gardiner, for respondent.

DYER, District Judge. This is a libel for salvage. Libellant's claim is based upon a service rendered September 2, 1877, by the propeller Scotia to the propeller Peerless, on an occasion when the Peerless was temporarily disabled by an accident to her machinery, on Lake Michigan; the service performed being that of taking the Peerless in tow and towing her into harbor at South Manitou, from the point where she was found, a distance of from forty to forty-five miles. Many witnesses have been examined, and the testimony which has been taken is very voluminous. But upon a careful and thorough examination of the evidence, I find the material facts to be considered to lie within narrow compass.

On the 31st day of August, 1877, the Peerless, a one-wheel screw steamer, then classed A 1, left the port of Chicago on a voyage to ports on Lake Superior, laden with passengers, and a full cargo of grain, live stock and general merchandise. Touching at the ports of Milwaukee, Sheboygan and Manitowoc, she left the last named port at 10:45 p. m., Sept. 1st, and at 11 o'clock, was put on her course to South Manitou passage, steering northeast quarter east. She pursued her voyage without interruption until about five o'clock the following morning, when her air pump was suddenly broken. The accident was of a very serious character, since it not only wholly disabled the steamer by depriving her of the use of her motive power, but enabled a large volume of water to pour through the discharge pipe of the pump from the lake into her hold. Measures were at once taken by the engineer and his assistants to arrest the flow of water through the discharge pipe, by shoring up the top of the pump, but they were unavailing. Meantime, the vessel's pumps were put in operation, and it being found that the only way to prevent the influx of water through the discharge pipe was to fill up the aperture from the outside, and as this aperture was below the surface of the water, and was on the starboard side of the vessel, orders were given by the master to throw overboard a quantity of the heavy freight lying on that side, including live stock, so as to list her to port, and thus bring the aperture above the surface of the water, thereby making it accessible from the outside. A flag of distress was also hoisted. In obedience to the orders of the master, so much of the deck load of freight on the starboard side, of vessel was thrown overboard as lightened her on that side sufficiently to bring the external orifice of the discharge pipe above the water of the lake. The small boat was then lowered, and the mate and some of the deck hands from this boat succeeded, by filling the discharge pipe with bags of flour, blankets and bedding, in stopping the flow of water into the vessel, but the steamer remained powerless to proceed on her voyage or to enter port without the assistance of another vessel. The Scotia, a propeller, laden with a valuable cargo, left Chicago on Saturday morning, Sept. 1, destined for the port of Buffalo. In the evening of that day, she was, as her master testifies, northward of Little Point Au Sauble, in the middle of the lake, and about thirty miles westward of her regular course. At ten o'clock that night her course was changed to north by west, upon which course she continued until daylight Sunday morning, Sept. 2. At about 6:30 o'clock that morning, the Peerless was discovered, from the deck of the Scotia, bearing to the northwest, flying a flag of distress, and as the master of the Scotia estimated the distance, about nine miles away. Necessarily changing her course somewhat, the Scotia went to the relief of the Peerless, reaching her in about an hour, and after the operations on the latter vessel by which the flow of water through her discharge pipe had been stopped, as heretofore detailed. The Scotia approached the Peerless on the leeward side, took her line and towed her to South Manitou harbor, a point about two and a half miles off the course vessels generally take in going through the south passage; and it was through that passage the Scotia was bound on her voyage from Chicago to Buffalo. At South Manitou the clerk of the Peerless and about fifteen of her passengers went aboard the Scotia, and were taken to Sheboygan, Mich., where the clerk engaged the tug Leviathan to proceed with him to South Manitou, and tow the Peerless to Milwaukee for repairs. While the Peerless was lying at South Manitou awaiting the arrival of a tug, and within the space of nine hours, the engineer, by disconnecting the air pump from the engine, and by constructing a wooden exhausting pipe, by means of which the process of ex-

hausting could be effected through one of the windows on the side of the vessel, succeeded in putting the boat in condition for propulsion by her own motive power. On Tuesday, the 4th day of September, the tug took the Peerless in tow, and the testimony of the engineer is, that the engine of the Peerless was in temporary working operation; that when a short distance from South Manitou, the tug became partially disabled; that the Peerless proceeded for some distance under her own steam; that the tug again took the propeller's line, but after a time let it go, and the Peerless went on to Milwaukee by her own power, making nine miles an hour between Sheboygan and Milwaukee. The value of the Peerless, which was a vessel of 1,200 tons burthen, was between $50,000 and $60,000. She was valued for insurance at $54,000. The value of her cargo was $30,000, and the value of that part jettisoned was $6,600. The Scotia was an iron bound vessel of 1,502 tons burthen, of the value of $150,000, and the value of her cargo was $48,800. The distance which the Scotia towed the Peerless was from 40 to 45 miles. The clerk of the Peerless testifies that the time covered by the service was about 8½ hours. The master of the Scotia fixes the time at 10 hours. The distance from the point where the Scotia varied from her course to go to the Peerless, to the point where the latter vessel was lying, was about nine miles, and about an hour was spent in passing that distance.

Very important elements in the case are the actual peril in which the Peerless was at the time the Scotia took her in tow, and the hazards incurred by the Scotia in affording her relief. Concerning the state of the weather, the crews of the two vessels, as is usual, differ as widely as possible; some of the witnesses for libellant testifying that the wind was almost a gale, causing a heavy sea, and some of the witnesses for respondent testifying that there was neither wind nor sea sufficient to put a yawl-boat in jeopardy. All agree that whatever wind there was, was from N. W. or N. N. W., and the various expressions of officers and men on the Peerless, as given in their testimony are, that it was "a breeze of wind, but nothing serious"; that it was "blowing a little"; "an 8 or 9 mile breeze"; that "there was very little sea"; that it was "a little lump of a sea"; "not what anybody would call a big sea"; that the Peerless "didn't roll any"; "may have rolled a little, but not much"; "lifted a little but didn't roll"; "rolled a little, but didn't lift up and down." This is the character of respondent's testimony, and there appears to be agreement on both sides that the wind and sea did not increase after the Scotia took the Peerless in tow. The officers of the Scotia say that the wind was blowing hard all through Saturday night, and the morning of Sunday, with rain squalls; that there was quite a

heavy sea running; and the master of the Scotia testifies that when about half a mile from the Peerless, he noticed that she was lying on her beam ends in the troughs of the sea.

The testimony of some of the passengers on the Peerless, who have been sworn for libellant, is to the effect that there was a violent wind and a high sea, and that the motion of the boat was so great that it was difficult to walk the deck or in the cabin. But their testimony is evidently to be taken with allowance, for the consternation among the passengers was so great at the time that many of them put on life preservers, and were in such a state of alarm as would lead them to exaggerate in their own minds every possible element of danger. Soon after the accident, and while efforts were being made on board the Peerless to relieve her from her most immediate peril, she was sighted by the schooner Lucerne, which went to her relief. The testimony of the captain of this schooner, and of Wm. Robson, a passenger on the Peerless, who seems to have fully retained his self-composure throughout the affair, and to have been a good observer, has been taken; and the testimony of these witnesses bears intrinsic evidence of being entirely trustworthy. Captain McLeod, of the Lucerne, says that the vessel was about 40 miles south of the South Manitou Islands, and about 17 miles from the east shore, when he discovered the Peerless four miles away, flying a flag of distress, and apparently lying in the troughs of the sea. The wind was about N. N. W., had been from that point all night, and was a strong, heavy wind. He took in all light sails, turned around and proceeded to the steamer. On arrival, he asked the captain of the Peerless what was the matter, and the captain replied: "We are all right now; there is a steamer coming up from the eastward" (meaning the Scotia). The Lucerne then passed on. Capt. McLeod says his vessel was then carrying all her lower canvass; that they had just clewed up her top-sails, taken in her square sails, raffee and three gaff top-sails, and that upon resuming his course he set his light sails. He describes the Peerless as lying in the troughs of the sea, drifting to leeward, and the weather as not pleasant; that it was blowing quite fresh, with cold, heavy rain squalls. He says: "There was quite a lump of a sea on"; that there was danger of injuring his vessel had he not taken in his light canvass after turning about to go to the Peerless; that the Peerless did not look to be in a very good position"; that she was drifting from 2 to 2½ miles an hour; that her small boat was in the lee of the propeller, with men in it who were endeavoring to fill the discharge pipe, and that others were keeping this boat off the guards of the steamer. The witness, Robson, details with minuteness, the efforts made to stop the influx of water through the discharge pipe, both in the engine room

and outside the vessel, and his testimony shows that it was with considerable difficulty the small boat could be kept away from the guards of the steamer, as the latter rose and fell with the waves. He says that it took fifteen or twenty minutes to fill the discharge pipe so as to stop the flow of water into the vessel. In his judgment there was not a very heavy wind blowing, nor a sufficient sea to cause much disturbance to passengers, though there was a slow roll in the motion of the boat. He says he was very much astonished to see the Lucerne and Scotia come so close to the Peerless, and that their officers seemed to manage their vessels as well as he (an Illinois farmer) would a pair of horses; which testimony is of value as indicating, at least to some extent, whether it was easy or difficult in the weather and sea prevailing to approach the Peerless and take her in tow. The witness, James Dunne, a passenger on the Peerless, states there was some wind, and "somewhat of a sea," but not so much as he had seen before, and that the vessel rolled some, but not so as to affect passengers very perceptibly in walking through the cabin. The clerk of the Peerless and some other of her officers, swear that when the Scotia arrived, her captain inquired what was the matter, and that the captain of the Peerless replied: "That the air pump was broke, and that he was all right now, but wanted a tow to the islands." This is contradicted by the men on the Scotia and by some other witnesses, and it seems probable that the witnesses who have testified to this remark have confused what was said at that time with the remarks made in response to the hail of the Lucerne when the master of the Peerless said, "We are all right now, there is a steamer coming."

Clearly the court would not be justified in adopting the extreme views of witnesses on either side, as to the state of the wind and sea at the time of and after the accident. But the testimony that has been referred to, and that of masters of other vessels' which were on the lake that night and morning, shows that the weather was unfavorable and capricious; that the wind was blowing with considerable force, and somewhat gusty, and that there was some sea. In short, I am satisfied that no vessel disabled and helpless, and in the condition of the Peerless, could lie in that locality, which was not very distant from the east shore, and drift in the troughs of the sea, without considerable peril. It is true that the officers of the boat say, that after the passage of water into the vessel was stopped, she was in no danger, but this cannot in the nature of things, be so. Her flag of distress was kept flying after that time, and there can be no doubt that the master and crew of the Peerless looked anxiously to the Scotia for relief. Before they succeeded in arresting the passage of water through the discharge pipe, the vessel was in the greatest peril, for in some parts of the hold the water was from 15 to 18 inches in depth, and aft of the crank room it was over three feet in depth; and the testimony is, that unless the efforts made to prevent the flow of water into the vessel had been successful, she would have sunk in an hour. And at best the relief obtained was temporary and precarious. She was 18 or 20 miles off shore and was drifting to leeward. Of course in considering this question of peril, there is to be taken into account the probability of the engineer being able to put her machinery in condition to enable her to get into some port by use of her own motive power, as it seems he was able to do while she was lying at South Manitou, but within what time this could have been done when the vessel was at sea is uncertain. In fact it was done in nine hours.

Although, as the Scotia went to the Peerless, she had to run in the troughs of the sea, I do not find from the evidence that the service was attended with any peculiar danger to the former vessel. The approach to the Peerless seems to have been readily accomplished, and her line taken without difficulty. Nothing occurred while the Peerless was in tow to place either vessel in unusual jeopardy. That the service rendered by the Scotia was not mere towage service is too plain for argument. Indeed, it is not seriously contended that it was not a salvage service. What compensation should be allowed, cannot be determined by any absolute rule. Libellant claims a much larger sum than the court can allow. Respondent insists upon a sum much below what seems compensatory for such a service. Counsel on both sides have referred to numerous cases in the books, and upon the data which they furnish, have submitted mathematical comparisons between values of property, time consumed, and salvage allowed in such cases, and values, and time employed in service, in the present case, for the purpose of aiding the court in arriving at a basis for a proper allowance here, but these comparisons are not entirely satisfactory.

Many cases may be found in which very large sums have been allowed as compensation for salvage service, but so far as I have observed, they were cases arising on the ocean, and disclosed services which were peculiarly and unusually meritorious. It would hardly do to adopt, as applicable to salvage service upon these inland waters, a measure of compensation which might prevail or be deemed proper when applied to such service upon the ocean, unless an exceptional case should seem to demand it. I shall award to libellant, as a reasonable salvage, $2,000.